UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RICHARD A. FOX, | ) |
| Plaintiff, | ) |
| vs. | ) 1:12-cv-00291-SEB-MJD |
| Dr. MICHAEL MITCHEFF, | ) |
| Dr. WILLIAM H. WOLFE, JOHN DALLAS, | ) |
| Defendants. | ) |

**Entry Discussing Motion for Summary Judgment**

This is a civil rights action in which plaintiff Richard A. Fox, an inmate at the Wabash Valley Correctional Facility, alleges that the defendants failed to provide proper medical care for his ongoing testicular pain while incarcerated at the Pendleton Correctional Facility. This civil claim is brought pursuant to 42 U.S.C. § 1983.

The defendants, Dr. Michael Mitcheff, Dr. William H. Wolfe and John Dallas, seek resolution of this action through summary judgment. Counsel was recruited pursuant to Local Rule 4-6 to assist Mr. Fox in responding to the motion for summary judgment.[1] For the reasons explained below, the defendants' motion for summary judgment [dkt. 76] is **granted.**

**I. Standard of Review**

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would

---

[1] The Court extends its sincere appreciation to Attorney Michael Parkinson for his willingness to assist the plaintiff in this action.

1

conclude in the moving party's favor. *See* Fed. R. Civ. Pro. 56. To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The key inquiry, is whether admissible evidence exists to support a plaintiff's claims, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections,* 175 F.3d 497, 504 (7th Cir. 1999). When evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial ... against the moving party." *Celotex,* 477 U.S. at 330.

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. Pro. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment. Fed. R. Civ. Pro. 56(e). That is the case here.

Mr. Fox has opposed the motion for summary judgment, but his response is inadequate to create a genuine issue of material fact. Local Rule 56-1(b) requires a brief in opposition to a motion for summary judgment to include a section labeled "Statement of Material Facts in Dispute" which responds to the movant's asserted material facts by identifying the potentially determinative facts and factual disputes which the nonmoving party contends demonstrate that there is a dispute of fact precluding summary judgment. These facts must be supported by appropriate citations to admissible evidence. See 56-1(e); *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir. 1993). The plaintiff did provide citations to factual assertions in

the argument section of his brief, but this district court is not required to "wade through . . . legal argument in search of a genuinely disputed fact." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir.2000). "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). The Court need only consider the cited materials, Fed. R. Civ. Pro. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson v. Cambridge Indus.,* 325 F.3d 892, 898 (7th Cir. 2003).

Mr. Fox's failure to properly oppose the motion for summary judgment with a statement of material facts in dispute supported by admissible evidence has a particular consequence, which is that he has admitted the truth of the defendant's statement of material facts for purposes of the Court acting on the motion for summary judgment. See *Johnson v. Gudmundsson,* 35 F.3d 1104, 1108 (7th Cir. 1994). This does not alter the standard for assessing a Rule 56 motion, but does "reduc[e] the pool" from which the facts and inferences relative to such a motion may be drawn. *Smith v. Severn,* 129 F.3d 419, 426 (7th Cir. 1997); *see also Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003) ("Smith's summary-judgment materials were woefully deficient in either responding adequately to the defendants' statement or in setting forth additional facts with appropriate citations to the record. As such, . . . the district court did not abuse its discretion in deeming admitted and only considering the defendants' statement of material facts.").

## II. Undisputed Facts

Applying the standards set forth above, the undisputed material facts are as follows:

**A. The Parties**

At all times relevant to the complaint, Mr. Fox was an inmate in the custody of the Indiana Department of Correction and was housed at the Pendleton Correctional Facility ("Pendleton").

Also during this time, John Dallas held the position of Vice President of Operations in Indiana for Corizon, Inc., f/k/a Correctional Medical Services, Inc. Mr. Dallas is not a physician and has never treated Richard Fox or any other offender. Mr. Dallas' former job title of Vice President of Operations in Indiana did not authorize him to dictate the course of treatment or appropriate medications for an inmate. Mr. Dallas did not supervise or in any way oversee the individual medical providers at Pendleton (or any other facility) with regard to their medical treatment of offenders. Mr. Dallas did not in any way tell the medical providers at Pendleton how to treat Mr. Fox. As a non-physician, Mr. Dallas relied upon the information he received from the medical providers who were seeing and caring for Mr. Fox.

At all times relevant to the complaint, Dr. Mitcheff was the Regional Medical Director for Corizon, Inc., f/k/a Correctional Medical Services, Inc. ("Corizon"), the company that contracts with the Indiana Department of Correction to provide medical care to various prisons throughout Indiana. Dr. Mitcheff currently serves as Medical Director for the Indiana Department of Correction. As Regional Medical Director for Corizon, Dr. Mitcheff hired facility physicians, reviewed requests for non-formulary medications, reviewed requests for outside consultations, and made alternative treatment suggestions, if appropriate, among other things.

The course of treatment for a particular offender is decided by the treating physician at the prison facility. As Regional Medical Director for Corizon, Dr. Mitcheff did not make treatment decisions for inmates including Mr. Fox. Rather, he reviewed requests from facility

physicians and occasionally provided guidance and alternative treatment suggestions. The facility physician still had the ultimate determination as to what course of treatment to pursue for a particular inmate.

Dr. Wolfe was one of several physicians at Pendleton at times relevant to the complaint. Dr. Wolfe would see inmates as they were placed on his schedule by nursing staff. He did not set or arrange the patient schedule.

**B. Mr. Fox's Medical Treatment**

On February 8, 2010, Dr. Wolfe first saw Mr. Fox due to his complaints of back pain. Mr. Fox also relayed mild left scrotal tenderness after hitting his scrotum on a piece of furniture. Dr. Wolfe's physical examination revealed a normal left testicle but with some mild tenderness which was likely the result of scar tissue from a previous epididymitis (inflammation of the tube that connects the testicle to the vas deferens) infection. In response, Dr. Wolfe prescribed Mr. Fox Keflex (an antibiotic). Dr. Wolfe did not prescribe any additional pain medication at that time as Mr. Fox was already receiving Mobic, which is an appropriate anti-inflammatory for mild pain. Dr. Wolfe then scheduled Mr. Fox to be followed in the chronic care clinic.

Dr. Wolfe next saw Mr. Fox on April 30, 2010, for follow-up of his scrotal and back pain. Based on Dr. Wolfe's assessment, which again confirmed normal testicles, he diagnosed Mr. Fox with epididymitis and prescribed the antibiotic Cipro 50 mg for 3 weeks. Mr. Fox continued to receive Mobic for pain management.

On June 2, 2010, Dr. Wolfe saw Mr. Fox for complaints of scrotal pain. Upon physical examination, Dr. Wolfe noted a small varicocele. A varicocele is a dilation of the veins in the scrotum above the testicle, and it is a fairly common finding, affecting 15-20% of all men. The vast majority of varicoceles are virtually painless, and surgery is typically a last option due to the

5

significant risk of recurrence or build-up of scar tissue which can leave the patient in a worse condition than before surgery. Mr. Fox was adamant that he had discussed his back and testicular issues with John Dallas and Dr. Michael Mitcheff and he demanded a urology consultation. Although Dr. Wolfe did not believe that a urology consultation was medically necessary for Mr. Fox's small varicocele, as a small varicocele in and of itself is not overly concerning, Dr. Wolfe went ahead and submitted a urology consultation request to appease Mr. Fox's demands. Dr. Wolfe also thought that a second opinion telling Mr. Fox that he was overly concerned with his testicles and that there was nothing medically troubling about his small varicocele would allay his fears.

After submitting the urology consultation request, Dr. Wolfe spoke with Corizon's Regional Medical Director at that time, Dr. Michael Mitcheff, about Mr. Fox's condition. Dr. Wolfe informed Dr. Mitcheff of his physical assessment, which included a normal left testicle with only a moderate and non-tender varicocele. Based upon the discussion between Dr. Wolfe and Dr. Mitcheff, they agreed that a urology consultation was not medically necessary at the time and that a conservative treatment approach, consisting of a scrotal support, pain medication, and monitoring of Mr. Fox's condition was appropriate and proceeded accordingly. Had Dr. Wolfe felt that Mr. Fox truly required a consultation with an urologist or other specialist, he could have, and would have, made it happen. However, Dr. Wolfe was comfortable and in agreement with Dr. Mitcheff's suggested course of action.

On July 5, 2010, Dr. Wolfe renewed Mr. Fox's medications, including his pain medication. On August 3, 2010, in an effort to further quell Mr. Fox's fears about his scrotum/testicles, Dr. Wolfe ordered blood tests, including an AFP (Alfa-fetoprotein) and ESR

(erythrocyte sedimentation rate) to check for the possibility of testicular cancer or chronic inflammation. Mr. Fox's test results returned normal.

Over the next few months, Mr. Fox continued to be concerned with his scrotum/testicles. In response, on October 18, 2010, Dr. Wolfe submitted a consultation request for an ultrasound of Mr. Fox's testicles in an effort to appease his demands/concerns. Dr. Wolfe did not feel that an ultrasound was medically necessary as his repeated physical exams had always confirmed no masses or abnormalities to Mr. Fox's testicles, however, Dr. Wolfe was attempting to further allay Mr. Fox's concerns as he did not seem to believe Dr. Wolfe when Dr. Wolfe told him that he did not have any medically concerning findings upon examination.

After submitting the ultrasound consultation request, Dr. Wolfe again discussed the issue with Dr. Mitcheff. Dr. Mitcheff requested additional information related to Dr. Wolfe's physical findings, to which Dr. Wolfe responded by describing a small pea-sized area of thickening at the epididymis that had not changed in size over the past year. Because the issue was epididymal and not testicular (which significantly reduced the cause for concern), and the fact that it had not changed in size over the past year according to Dr. Wolfe's physical exams, Dr. Mitcheff suggested that Dr. Wolfe continue to follow the issue clinically, to which Dr. Wolfe concurred. Had Dr. Wolfe felt that an ultrasound was medically necessary for Mr. Fox at that time, he could have, and would have, made it occur. Instead, Dr. Wolfe agreed with and made the decision to follow Dr. Mitcheff's recommendation to follow the issue clinically, and if Dr. Wolfe later noticed any changes to Mr. Fox's condition, he would reconsider an ultrasound or referral to a specialist. Dr. Mitcheff received no other consultation requests and had no further involvement with Mr. Fox's care.

On October 27, 2010, Dr. Wolfe evaluated Mr. Fox for complaints of back pain. Mr. Fox wanted stronger pain medication for his back. Dr. Wolfe informed him that narcotic pain medication is not medically appropriate for chronic pain and would not be ordered. Mr. Fox made no complaints regarding his scrotum/testicles. On November 5, 2010, Dr. Wolfe changed Mr. Fox's Mobic prescription to Naprosyn, per his request.

On December 7, 2010, Dr. Wolfe evaluated Mr. Fox in response to complaints of pain from his varicocele. Mr. Fox also stated that he had been experiencing intermittent prostatic discharge and blood in his semen. In response, Dr. Wolfe ordered Cipro (antibiotic) for 30 days and a scrotal support. Dr. Wolfe did not order additional pain medication as Mr. Fox was already receiving Naprosyn, which was appropriate for his condition.

Dr. Wolfe next saw Mr. Fox on February 15, 2011. At that time, Mr. Fox complained of discomfort with his varicocele. Dr. Wolfe's physical exam confirmed a stable varicocele. Mr. Fox wanted a better fitting scrotal support and back belt, which Dr. Wolfe ordered for him. On March 3, 2011, Dr. Wolfe informed Mr. Fox that Dr. Wolfe ordered a regular athletic supporter for him in response to his complaints that the scrotal support did not provide relief.

In response to Mr. Fox's complaints about his testicles, Dr. Wolfe responded with a letter on March 16, 2011, and explained how Mr. Fox's complaints did not make sense from a medical standpoint. For instance, Mr. Fox would claim that his testicle was swollen and then state that it was shrinking in size. Dr. Wolfe also explained to Mr. Fox that it was not medically possible to pull the testicle and cause a hook position of the penis as the testicle and its cremaster muscle are not attached to the penis and contraction of that muscle cannot pull on the penis. Dr. Wolfe informed Mr. Fox that his concerns would be further discussed at his next medical visit. On March 19, 2011, Dr. Wolfe again wrote to Mr. Fox and informed him that if a significant testicle

or penis problem was discovered at their next visit, Dr. Wolfe would reconsider sending Mr. Fox to an outside specialist.

On March 22, 2011, Dr. Wolfe evaluated Mr. Fox due his scrotal concerns. Dr. Wolfe's physical exam once again revealed a normal scrotum with no masses or tenderness. Mr. Fox's testicles were symmetrical and non-tender, and his penis was normal. Mr. Fox did display some tenderness to his left epididymis, suggesting a possible infection (epididymitis), for which Dr. Wolfe prescribed Cipro for 30 days. Based upon Dr. Wolfe's examination, nothing about Mr. Fox's scrotum or testicles was a significant cause for concern or required a referral to a specialist of any kind.

In July and August of 2011, in response to letters from Mr. Fox claiming he was discharging "pus" from his urethra, Dr. Wolfe ordered containers be provided to Mr. Fox to collect and analyze a sample of the "pus." On August 29, 2011, Dr. Wolfe reordered Mr. Fox's Tegretol (pain medication).

On September 2, 2011, Dr. Wolfe saw Mr. Fox in the Chronic Care Clinic for several issues, including complaints of testicular pain. Mr. Fox could not provide a sample of his "pus" for analysis. Despite Mr. Fox's failure to provide a sample, Dr. Wolfe ordered Rifampin (antibiotic) for 30 days to address any potential infection. Dr. Wolfe's physical exam revealed inconsistent epididymis tenderness and no unusual masses and no penile discharge. On October 25, 2011, Dr. Wolfe increased Mr. Fox's Tegretol dosage due to his complaints of back pain. This medication was also appropriate to address Mr. Fox's complaints of scrotal/testicular pain.

On December 15, 2011, Nurse Practitioner Mary Coyle evaluated Mr. Fox. Mr. Fox alleged that he had been urinating pus and blood. However, when NP Coyle offered to perform a

"UA" (urinalysis) to check for an infection or blood in the urine, Mr. Fox was unable to provide a sample.

On March 7, 2012, Dr. Wolfe evaluated Mr. Fox for the last time. At that time, Mr. Fox had no new testicular complaints and did not seem concerned about the issue. Following this visit in March, Mr. Fox transferred out of Pendleton and was no longer under Dr. Wolfe's care.

Throughout Dr. Wolfe's course of care of Mr. Fox, Dr. Wolfe used his medical judgment and thoughtfully monitored Mr. Fox's condition on a regular basis through numerous physical examinations and follow-ups, which was an appropriate course of action and within the standard of care for Mr. Fox's condition.

Dr. Mitcheff's suggested alternatives to Dr. Wolfe in response to his consultation requests were not monetarily based, but were instead based upon the physical assessments Dr. Mitcheff was provided by Dr. Wolfe, along with Dr. Mitcheff's experience, education and training as a physician. In Dr. Mitcheff's professional opinion, Mr. Fox received appropriate medical care for his complaints of scrotal pain. It is also Dr. Mitcheff's professional opinion that it was not medically necessary to send Mr. Fox to an urologist or obtain an ultrasound for a varicocele that was stable.

John Dallas' involvement with Mr. Fox was limited to receiving several letters from him in 2010 and 2011 regarding his complaints of scrotal and back issues. In response to each, Mr. Dallas would contact the facility medical staff to get a better understanding of Mr. Fox's condition and the care being provided, and Mr. Dallas would then respond to Mr. Fox's letters with what he had gathered from his discussions with Mr. Fox's medical providers. As a non-physician, Mr. Dallas relied upon the information he received from the medical providers who were seeing and caring for Mr. Fox.

## III. Discussion

The defendants argue that they are entitled to summary judgment because there is no evidence that they were deliberately indifferent to Mr. Fox's scrotal and testicular issues.

The Eighth Amendment imposes a duty on prison officials to provide medical care to inmates. *Vance v. Peters,* 97 F.3d 987, 991 (7th Cir. 1996), *cert. denied,* 520 U.S. 1230 (1997). In order for an inmate to state a claim under § 1983 for medical mistreatment or denial of medical care, the prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). Deliberate indifference exists only when an official "knows of and disregards an excessive risk to an inmate's health; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (construing *Estelle*). A condition is serious if "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir. 1997) (citation and internal quotations omitted).

The defendants have shown that there was no violation of Mr. Fox's federally secured rights associated with the delivery of necessary medical services to treat Mr. Fox's testacies and scrotum during his confinement at Pendleton. A court examines the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs. *Reed v. McBride,* 178 F.3d 849, 855 (7th Cir. 1999). The most which is established here is that Mr. Fox has a simple epididymal cyst that does not exceed ¼ inch in size and that the defendants have exercised their professional judgment in Mr. Fox's best

interests, and well within the bounds of the Constitution, in meeting his medical needs and concerns.[2]

Even if Mr. Fox's simple cyst is a serious medical need, John Dallas is entitled to summary judgment because he made no medical decisions related to Mr. Fox, nor did he impede Mr. Fox's access to necessary medical care. Mr. Dallas' role in this action was limited to receiving Mr. Fox's letters, and investigating the complaints alleged in those letters by speaking with Mr. Fox's medical providers before providing Mr. Fox a response. Mr. Dallas is not a medical provider and was justified in relying on Mr. Fox's treating providers' expertise and representations when responding to Mr. Fox's letters. *See Hayes v. Snyder,* 546 F.3d 516, 527 (7th Cir. 2008)("The policy supporting the presumption that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care is a sound one."). For these reasons, Mr. Dallas is entitled to judgment as a matter of law.

As to Drs. Wolfe and Mitcheff, the evidentiary record negates the presence of the subjective state of mind required to show deliberate indifference, *i.e.,* that the defendants were "subjectively aware of [Mr. Fox's] serious medical needs and disregarded an excessive risk that a lack of treatment posed to his health or safety." *Wynn v. Southward,* 251 F.3d 588, 593 (7th

---

2 Although not appearing in either parties' Statement of Material Facts or Statement of Material Facts in Dispute, both parties discuss Mr. Fox's September 3, 2014, testicular ultrasound. According to Dr. Wolfe's affidavit:

> "the ultrasound confirms that Mr. Fox has only one 'simple cyst.' Second, epididymal cysts are not rare and up to 30% of men have one or more of these cysts. They are not malignant and their presence does not increase the risk of cancer. They vary in size, up to the size of a grapefruit. Small cysts, such as Mr. Fox's, do not pose any medical consequence and surgical treatment is not advised since the health risks of invasive treatment far outweigh the possible negligible benefit."

Dr. Wolfe Aff., dkt. 88-1 at ¶ 6.

Cir. 2001). For example, the record reflects that Dr. Wolfe undertook repeated efforts to address Mr. Fox's complaints. He performed multiple physical examinations of Mr. Fox's testicles, ordered scrotal supports, blood tests to rule out testicular cancer and chronic inflammation and provided pain medication which Mr. Fox conceded helped reduce his pain to a mild level. Dr. Wolfe also prescribe antibiotics when Mr. Fox subjectively complained of symptoms of a possible infection (even when multiple urinalysis tests returned negative).

Mr. Fox argues that Dr. Mitcheff is liable because he failed to accept Dr. Wolfe's recommendation to refer Mr. Fox to an urologist and for an ultrasound. The record reflects, however, that Dr. Mitcheff and Dr. Wolfe discussed Mr. Fox's medical concerns. Dr. Mitcheff suggested alternative treatment options and there is no evidence that these treatment options were outside the standard of care and not based on sound medical judgment. Dr. Wolfe and Dr. Mitcheff did not believe that a consultation with a specialist was medically necessary for Mr. Fox condition. In addition, although Mr. Fox argues that he remained in constant pain from his condition, there is no evidence that Dr. Wolfe or Dr. Mitcheff knew that Mr. Fox was in constant pain. Instead, Dr. Wolfe adequately responded to Mr. Fox's complaints of pain (which he described in his depositions as "mild" while taking his pain medication) by prescribing pain medication. Because of this showing, the defendants are entitled to the entry of judgment in their favor and against the plaintiff. *Celotex Corp.*, 477 U.S. at 322-23 (explaining that when the moving party has met the standard of Rule 56, summary judgment is mandatory).

### IV. Conclusion

There is no doubt that Mr. Fox was entitled to certain constitutional protections while confined at Pendleton, including constitutionally adequate medical care. He has not, however, come forward with a genuine issue for trial. *Liberles v. County of Cook,* 709 F.3d 1122, 1126

(7th Cir. 1983) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered."). "Summary judgment is not a discretionary remedy. If the plaintiff lacks enough evidence, summary judgment must be granted." *Jones v. Johnson,* 26 F.3d 727, 728 (7th Cir. 1994), *cert. granted* 513 U.S. 1071 (1995). That is precisely the situation with respect to the present case, and the defendants' motion for summary judgment must therefore be **granted**.

Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 1/26/2015

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

All Electronically Registered Counsel